RECORD NUMBER: 14-2384

# United States Court of Appeals

### *for the*

# Fourth Circuit

**FRANCES BRADEN,**

*Plaintiff/Appellant,*

– v. –

**CHESAPEAKE APPALACHIA, LLC,**

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING

# OPENING BRIEF OF APPELLANT

**TERESA C. TORISEVA**
**JOSHUA D. MILLER**
TORISEVA LAW
**1446 National Road**
**Wheeling, WV 26003**
**(304) 238-0066**
**ceo@torisevalaw.com**
**jdm@torisevalaw.com**

*Counsel for Appellant*

CP  COUNSEL PRESS • VA – (800) 275-0668

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus
case, except that a disclosure statement is **not** required from the United States, from an indigent
party, or from a state or local government in a pro se case.  In mandamus cases arising from a
civil or bankruptcy action, all parties to the action in the district court are considered parties to
the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are
required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the
required disclosure statement, counsel may file the disclosure statement in paper rather than
electronic form.  Counsel has a continuing duty to update this information.

No. __14-2384__     Caption: __Frances Braden v. Chesapeake Appalachia, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Frances Braden__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                               ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _Teresa C. Toriseua_          Date: ___01/02/2015___

Counsel for: Appellant, Frances Braden

## CERTIFICATE OF SERVICE
****************************

I certify that on ___January 2, 2015___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Kenneth E. Tawney, Esq.
Jackson Kelly PLLC
PO Box 553
Charleston, WV 25322

_Teresa C. Toriseua_                              ___01/02/2015___
      (signature)                                       (date)

- 2 -

# **<u>TABLE OF CONTENTS</u>**

**<u>Pages</u>**

TABLE OF AUTHORITIES ................................................................. ii

Jurisdictional Statement ...............................................................1

Statement of the Issue ..................................................................1

Statement of the Case....................................................................1

Statement of Facts........................................................................2

Standard of Review ......................................................................4

Summary of Argument ..................................................................5

Argument ......................................................................................6

    1.  The district court erred by failing to find a genuine issue of material fact existed in Chesapeake's acts leading up to and including the bad faith unitization of the Braden property into the 2nd Amended Declaration and Notice of Pooled Unit solely to extend the Braden lease without compensation to Ms. Braden………………………..6

        a.   Chesapeake needed more time to exploit the minerals lying under the Braden property. Because Chesapeake could not timely and in good faith extend the Braden lease into its second term, Chesapeake developed a plan to artificially extend the lease without Ms. Braden's consent..........................6

        b.   The district court erred in not construing the lease in a light most favorable to the lessor, Ms. Braden and subsequently concluding no genuine issue of material fact existed regarding paragraph 10 of the Braden lease did not contain vague and ambiguous unitization language……………………………15

Conclusion. ..................................................................................17

Oral Argument Request. ..............................................................18

Certificate of Service .

## TABLE OF AUTHORITIES

**Statutes**                                                                    **Pages**

28 U.S.C. § 1291 ..................................................................................... 1

28 U.S.C. § 1332(a) ............................................................................... 1

Fed. R. Civ. P. 56(c) ............................................................................. 4

W. Va. Code § 55-13-1, *et seq* .......................................................... 1-2


**Cases**                                                                          **Pages**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ..................................................................... 5, 16

Estate of Tawney v. Columbia Natural Res., LLC, 219 W. Va. 266, 273 (W. Va. 2006) ....................................................................................... 15

Fleming Oil & Gas Co. v. South Penn Oil Co*.*, 17 S.E. 203 (W. Va. 1893) .............. ....................................................................................... 10, 14, 15

Helm v. Western Md. Ry. Co., 838 F.2d 729, 734 (4th Cir. 1988) ......................... 4

Henry v. Chesapeake Appalachia, L.L.C., 739 F.3d 909, (6th Cir. 2014) ................. ....................................................................................... 12,13, 14, 15

Pignons S.A. De Mecanique v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981) .5

Unus v. Kane, 565 F.3d 103, 115 (4th Cir. 2009) ................................................. 16

Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ........................................ 16

## JURISDICTIONAL STATEMENT

Originally filed in West Virginia state court, the United States Federal District Court for the Northern District of West Virginia exercised jurisdiction pursuant to 28 U.S.C. § 1332(a) after removal by the defendant/appellee. Plaintiff/Appellant's Motion to remand was denied. On November 21, 2014, Judge Frederick P. Stamp entered an Order granting the defendant's motion for summary judgment and denying the plaintiff/appellant's motion for judgment. Appellant Frances Braden timely appealed. This Court has jurisdiction based on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Did the district court err in dismissing this action on summary judgment by failing to find a genuine issue of material fact that the pooling clause of the oil and gas lease was expanded beyond its writing to allow Chesapeake Appalachia, L.L.C. to artificially capture Ms. Braden's property thereby extending the lease into its secondary term?

## STATEMENT OF THE CASE

Plaintiff-Appellant Frances Braden originally filed this action in state court in West Virginia seeking only a declaratory judgment under W. Va. Code § 55-13-

1, *et seq*, that the oil and gas lease entered into by the parties had expired on August 23, 2012. Ms. Braden's position is the specific location of the common well pad (the Timmy Minch Northwest Unit) in relation to the appellant's 135 acre tract made it impossible to consider the Braden property pooled with the Timmy Minch Northwest Unit (TMNWU) on August 23, 2012 under the terms of the oil and gas lease signed August 23, 2007.

## STATEMENT OF FACTS

Frances Braden, an elderly widow, owns a tract of land in the Triadelphia District of Ohio County, West Virginia of approximately 135 acres. [See: J.A. 78-82, Appellant's Exhibit 1]. Mrs. Braden also owns a tract of land of approximately 3.5 acres that is contiguous to the above tract of land. [See:  J.A. 83-83, Appellant's Exhibit 2: Deposition of Frances Braden, Page 28, Line 5-10]. Mrs. Braden executed an Oil, Gas, and Coalbed Methane Lease (The Braden Lease) with Great Lakes Energy Partners on August 23, 2007 for the 135 acre tract of land. [See: J.A. 90-92, Appellant's Exhibit 3]. The Braden Lease contained paragraph 2 which states:

> "This lease shall continue in force and the rights granted hereunder be quietly enjoyed by the Lessee for a term of five (5) years and so much longer thereafter as oil, gas, coalbed methane gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee, or as the premises shall be operated by the Lessee in the search for oil, gas

2

and/or coalbed methane gas and as provided in Paragraph 7 following." [See: J.A. 90-92].

The above lease had a primary term of five years, which would have expired on August 23, 2012. [See: J.A. 90-92]. The Defendant Chesapeake Appalachia, LLC acquired the Braden Lease. [See: J.A. 93-96, Appellant's Exhibit 4, Deposition of Bryan Lohoff, Page 13, Line 8]. In the Spring of 2012, the Defendant attempted to have Mrs. Braden sign an oil and gas lease for the separate 3.5 acre tract of land that was contiguous to the 135 acre tract. [See: J.A. 97-103, Appellant's Exhibit 5, unsigned lease "Paid Up Oil and Gas Lease"; See Also: J.A. 104-106.1, Appellant's Exhibit 6, Deposition of DJ Schrekengost, Page 10, Line 14 to Page 12, line 10]. Ms. Braden argues this was deceptive because the 3.5 acre lease contained a contiguous lands clause that could allow Chesapeake to argue that the 135 acre tract was included in the 3.5 acre tract lease because they are contiguous. In the Summer of 2012, Defendant's employee Landman, Attorney Larry Skryzowski, approached Mrs. Braden at her home in an effort to get her sign a one-year extension of the Braden Lease. [See: J.A. 107-110, Exhibit 7. See Also: J.A. 83-89, Deposition of Fran Braden, Page 8, Line 20 to Page 9, Line 8; See Also: J.A. 111-114, Appellant's Exhibit 8, Deposition of Larry Skryzowski, Page 11, Lines 3-20]; Mrs. Braden declined each and every offer to extend. [See: J.A. 9-15 at paragraph 15].

3

Prior to August 14, 2012, the Braden property was separated from the Timmy Minch West Unit by property that was not controlled by Chesapeake and not in the Timmy Minch West Unit. The Braden property was approximately one (1) mile to the southwest of the drill site and did not border any property in the Timmy Minch West Unit. But on August 14, 2012, just days prior to the expiration of the primary term of the Braden Lease, Chesapeake unilaterally included the Braden property into the Second Amended Declaration and Notice of Pooled Unit and renamed the existing unit the Timmy Minch Northwest Unit. [See: J.A. 154-160, Appellant's Exhibit 10]. There was no drill permit that could authorize a drill to access the Braden property or even drill in the direction of the Braden property from the drill site. There was no permitted well to access any oil, gas, or their constituents under the Braden property until November 8, 2012, almost two and half months after the Braden Lease expired. [See: J.A. 115-153, Appellant's Exhibit 9, Well Work Permit #47-6900153].

## STANDARD OF REVIEW

Orders granting summary judgment are reviewed *de novo*; that is, the appellate court, without deference, applies the same standard as did the trial court. Helm v. Western Md. Ry. Co., 838 F.2d 729, 734 (4th Cir. 1988). Summary judgment is proper only when there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). In other words, to grant summary judgment the court must determine

4

that no reasonable jury could find for the nonmoving party on the evidence before it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). And, in evaluating a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. Pignons S.A. De Mecanique v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981).

## SUMMARY OF ARGUMENT

By granting summary judgment for the defendant Chesapeake Appalachia, LLC and simultaneously denying summary judgment for the appellant, the district court erroneously found that no genuine issue of material fact existed when it concluded that the pre-textual unitization of the appellant's property into an otherwise unrelated unit successfully extended the oil and gas lease that is the subject of this litigation.

Chesapeake admittedly needed more time to successfully exploit the natural resources lying beneath the Braden property than the lease provided. To get that extra time, Chesapeake attempted on two separate occasions to secure Ms. Braden's signature on a written extension. Ms. Braden refused both attempts. Only after both attempts failed, Chesapeake, nine (9) days before the lease expired, unilaterally and in bad faith added the Braden property to an existing unit that had no other relationship to the Braden property other than it was geographically in the

area. Without this bad faith inclusion of the property into the unit, the Braden lease expired on August 23, 2012.

Also, the Braden lease was for a five-year term or for so long as gas is being produced or capable of being produced in paying quantities. Five years after the lease was signed, considering all of the Chesapeake documents and West Virginia Department of Environmental Protection documents that were in place on August 23, 2012 relative to the Braden property, and the lack of any equipment or physical ability to drill, the Braden property was not capable of producing any gas, oil or their constituents, a specific requirement of the extension of the lease.

## ARGUMENT

**I.** **The district court erred by failing to find a genuine issue of material fact existed in Chesapeake's acts leading up to and including the bad faith unitization of the Braden property into the 2nd Amended Declaration and Notice of Pooled Unit solely to extend the Braden lease without compensation to Ms. Braden.**

 **a.** **Chesapeake needed more time to exploit the minerals lying under the Braden property. Because Chesapeake could not timely and in good faith extend the Braden lease into its second term, Chesapeake developed a plan to artificially extend the lease without Ms. Braden's consent.**

The Braden lease contained the following language at Paragraph 10:

> "10. Lessor herby grants to the Lessee the right at any time to consolidate the leased premises or any part thereof or strata therein with other lands to form a oil, gas, and/or coalbed methane gas development unit of not more than 640 acres, or such larger unit as may be required by state law or regulation

6

for the purpose of drilling a well thereon, but the Lessee shall in no event be required to drill more than one well on such unit. Any well drilled on said development unit whether or not located on the leased premises, shall nevertheless be deemed to be located upon the leased premises within the meaning and for the provisions and covenants of this lease to the same effect as if all the lands comprising said unit were described in and subject to this lease."

Chesapeake needed more time to develop the Braden property and the lease was expiring. [See: J.A. 111-114, Appellant's Exhibit 8: Deposition of Larry Skryzowski at Page 48, Lines 4-20]. Bryan Lohoff and Amber Vawter, both Chesapeake employees, had an email conversation on June 13, 2012 discussing the plan to hold the Braden lease with the OHI-1H well and then move the Braden property into another unit later after a plan could be devised to develop the Braden property using the Chevron acreage.[1] [See: J.A. 233-243, Appellant's Exhibit 13, email chain Chesapeake Bate Stamp #269, 270]. This discussion clearly shows the intent of Chesapeake to deceptively ("creatively") pool/unitize the Braden property for the sole purpose of artificially extending the lease and holding it by production (production that could not be actually attributed to Braden) with the sole intent to buy time until a development plan could be figured out. Chesapeake has admitted

---

[1] The "Chevron acreage" refers to leased property owned by others not Braden in the immediate area that was not controlled by Chesapeake prior to August 23, 2012. Control of the oil and gas leases was obtained by Chesapeake from Chevron December 1, 2013. [See: J.A. 233-243, Appellant's Exhibit 13, Assignment, Bill of Sale, and Conveyance, Chesapeake Bates Stamp #1418].

the same in its Motion for Summary Judgment. [See: Document 53, Page 4, last line of first paragraph].

The plan is first developed and discussed by Lohoff, Vawter, and other Chesapeake employees on June 12, 2012 in another email from Lester Zitkus to Lohoff, Skryzowski and others. [See: J.A. 232, Appellant's Exhibit 12, email chain at Chesapeake Bates Stamp #253]. That email states in its entirety:

> Don't know if you all were on the 10:15 call, but we have a couple of action items to chase down quickly on this issue. First, are there any unit restrictions that would prevent us forming a unit going both north and south from the Minch pad **to capture the expiring acreage to the south that would have been saved from the Park Commission site**? If we have restrictions, what type of unit can be formed with/without the unleased school property. **Need to get creative on unit formation giving timing. If we can form one N/S unit based on Minch 1H, we buy a ton of time.** Folks are working to permit second Minch well to kick out and drill south, so if one north/south unit doesn't work, need to form south unit and file DPU given the expiring acreage is a "build" type lease (I'm told) and we have built the location and are applying for permit **so could make argument that we have already done enough to save for now**. Lastly, as a potential plan C, folks are looking at a south location which would involve Chevron trade acreage. We need to determine lease terms/restrictions on pooling if we were to put a pad on CHK acreage along the main road to the south and drill north in to the school acreage and expiring acreage. Please work as quickly as possible to evaluate all these options and outline what we can/can't do based on the lease restrictions.

> Emphasis added.

This plan materialized on or about August 14, 2012. To aid the Court, Exhibit 14 shows how the Timmy Minch Unit physically looked February 15,

2012, around the time Chesapeake first attempted to have Ms. Braden execute a one-year extension and before the attempted contiguous land trick. [See: J.A. 31, Appellant's Exhibit 14]. The diagram shows the following: the Braden property lies to the south of the TMNWU, the Braden property is not contiguous to the unit Chesapeake deceptively placed it in, there is un-included ground between the unit and the Braden property, and finally, the unit and the only permitted drill travel in the exact opposite direction of the Braden property. Further, Exhibit 15 shows the effect and the deception of "creative" plan: the Braden property added to the unit with by connecting it with an irregularly shaped piece of property clearly added solely to bridge the gap between Timmy Minch Unit and the Braden property. [See: J.A. 32, Appellant's Exhibit 15]. Construing these facts in a light most favorable to Ms. Braden, this email shows the intent of Chesapeake to deceptively pool/unitize the Braden property for the sole purpose of having a legal argument to artificially extend the lease.

Pooling/unitization agreements do not afford the energy company limitless unilateral power to hold property when there is no ability to physically or legally drill the property and clearly no intent to drill the property using the current unit and wellbore. Chesapeake should not be permitted to "creatively" broaden the language in such a way that permits the pooling, unitizing, and "buy a ton of time" and "make the argument that we have already done enough to save for now". This

"creative" plan allows any lease to be unitized unilaterally no matter its propriety and thereby be extended, depriving the landowner of property rights. If leased property is artificially held by production into its secondary term, it is then artificially held indefinitely until Chesapeake chooses to release it.

Some attention should be paid to the word "drilling" and what it means in an oil and gas lease. The most obvious definition of "drilling" means the process of boring a hole into the ground using mechanical equipment for the purpose of extracting mineral resources and/or other fluids. Appellant concedes "drilling" in the horizontal drilling industry also means that when more than one property is legally unitized into a unit and a drill is placed on one of the properties, all properties in that unit are considered to be drilled. This is true even when the above-ground drill site is physically only on one property in the unit and notwithstanding the underground portion of the drill never actually touching all properties in the unit. But here, since the Braden was not legally unitized and because no drilling activity actually took place on the Braden property, no drilling can be said to have taken place on the Braden property.

This is where Chesapeake argues analysis under <u>Fleming Oil & Gas Co. v. South Penn Oil Co.</u>, 17 S.E. 203 (W. Va. 1893) is appropriate. <u>Fleming</u> discussed and ruled what amounted to actual drilling activity on the subject property. The question was whether or not certain activity amounted to drilling activity, even

10

though it was not actual drilling, sufficient to extend the lease. In <u>Fleming</u>, some level of physical activity occurred directly on the Fleming property. But <u>Fleming</u> does not apply in the Braden case because an evaluation of the extent of drilling activity on the Braden property is not necessary. Any drilling activity said to be conducted on Braden is vicarious, that is, it is activity not occurring actually within the boundaries of the Braden property, but only happened on the Timmy Minch property. If the unitization is held to be legal (Braden, of course, does not believe it should be), the drilling activity will be considered to have occurred on Braden even though it actually did not occur on Braden.

It is important to note here the Braden property has been placed into yet another amended unit. Without being drilled while in the Second Amended Declaration and Notice of Pooled Unit it was put into on August 14, 2012, it was placed into the Third Amended Declaration and Notice of Pooled Unit for the Timmy Minch West Unit on August 8, 2013. [See: J.A. 244-249]. This shows no intent to drill the Braden property prior to the expiration of the primary term and shows Braden property could not possibly produce oil, gas, or their constituents.

As stated above, there is no West Virginia case law on point to guide the Court regarding these specific, discrete issues.  The case law simply has not yet caught up with the state of the oil and gas industry since the recent shale gas boom began. The Sixth Circuit Court of Appeals addressed some similar, but not exact,

issues in <u>Henry v. Chesapeake Appalachia, L.L.C.</u>, 739 F.3d 909, (6th Cir. 2014). In <u>Henry</u>, the Plaintiff Henry brought an action for a declaration that the oil and gas lease for the property had expired on October 17, 2011. Plaintiff's argument was that the sole act of filing of a Declaration and Notice of Pooled Unit including the Plaintiff's property near the expiration date of the lease was not enough to extend the lease without Chesapeake having filed a drilling permit that included the Plaintiff's property. The Federal District Court agreed with the Plaintiff and granted summary judgment for the plaintiff. The Sixth Circuit disagreed on Chesapeake's appeal by reversing the district court's decision and finding in favor of Chesapeake.

In addition to the rule that the 6th Circuit's opinion is not binding authority on this Court, there are not enough facts explained in <u>Henry</u> to make <u>Henry</u> apply in this case. The Henry property <u>bordered</u> the unit Chesapeake placed the property in, the Asuncion Unit, but the case does not explain where the Henry property is located in relation to the drill site, the original unit, whether or not oil and gas were *capable* of being produced from the Henry property, how much of the Henry property borders the Asuncion unit, or the direction of the well bore. These are all key facts that if explained in <u>Henry</u> could give this Court guidance in this case. The filing of the DPU in <u>Henry</u> was inextricably linked to the physical activity that

Chesapeake undertook to actually produce gas from Henry as part of the Asuncion unit. To quote Henry:

> "[s]till, the act of filing the DPU did not occur in a vacuum; Chesapeake did not simply file a piece of paper that had no practical effect on its use of plaintiff's property. Rather, because operations had already commenced on the Asuncion unit, the filing of the DPU was an act in an endeavor to join Plaintiff's property in the production unit that Chesapeake was in the process of exploiting." [at Henry 914.]

The Court in Henry is clearly indicating the physical activities undertaken by Chesapeake prior to the filing of the DPU that included the Henry property are linked to the filing of the DPU. But the Henry Court went on to say in the same paragraph:

> "Whether the filing of the DPU had the effect of unitizing under the lease or not, it was clearly an act similar to or incidental to acts 'in search for or in an endeavor to **obtain, maintain or increase the production of oil and/or gas' from the Plaintiff's property**." [Footnote Omitted. Emphasis Added. Id.]

In the absence of affirmative facts, the analysis assumes because the Henry property actually bordered the Asuncion unit, including it into the Asuncion Unit would allow Chesapeake to obtain, maintain or increase the production of oil and gas from the Henry property itself. The Henry Court did not discuss the direction of any wellbore that drilled the Asuncion Unit.

Conversely, because the location of the Braden property is south of the OHI-1H well, the only well on the Timmy Minch drill site, oil and/or gas were not

capable of being produced at the time the lease expired. In fact, as previously noted, there are significant gaps of uncontrolled property in the Minch Unit moving toward the Braden property so as to make it impossible for the Braden property to be capable of producing gas from the then existing Minch Unit. Here, all of the physical activity conducted by Chesapeake was for a wellbore that travelled away from the Braden property and could not have allowed Chesapeake to obtain, maintain, or increase the production of oil and gas form the actual Braden property. Because the physical activities commenced by Chesapeake were for a wellbore that could not produce Braden, the filing of the 2nd Amended Declaration and Notice of Pooled Unit absolutely occurred in a vacuum. It amounts to the filing of a piece of paper that has no practical effect on the Braden property. Had the Braden property actually bordered the TMNWU prior to August 23, 2012, Ms., Braden's position would be different.

Neither <u>Henry</u> nor <u>Fleming</u> contain facts that are specific to the case currently at bar. That is, neither case contains the following facts:

- Chesapeake admitted to needing more time to develop the expiring lease.

- Chesapeake unsuccessfully attempted to extend the Braden lease by having Mrs. Braden sign a direct one year extension.

- Chesapeake then attempted to renew the 135 acre tract by having Mrs. Braden sign a 5 year lease for an adjoining small tract of property that contained language leasing "all contiguous property".

14

- Chesapeake's getting "creative on unit formation giving timing" so that Chesapeake "could make the argument that we have already done enough to save [the expiring lease] for now".

- The gap of uncontrolled or un-unitized property between the TMNWU and the Braden property.

Henry and Fleming are both factually oil and gas cases. Their individual similarities to the current case before the Court end there. Because Braden involves horizontal drilling and unitization, it has a unique set of facts that could not have been anticipated in the days of Fleming. Horizontal drilling and unitization were not developed until much later after the Fleming case was decided. Further, while Henry is recent, and even concerns horizontal drilling and unitization, its facts do not closely mirror Braden enough to use Henry as guidance to decide that a genuine issue of material fact does not exist.

      **b. The district court erred in not construing the lease in a light most favorable to the lessor, Ms. Braden and subsequently concluding no genuine issue of material fact existed regarding paragraph 10 of the Braden lease did not contain vague and ambiguous unitization language.**

Without on-point West Virginia oil and gas case law to use as guidance, case law sounding in contract law must be used. The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor and strictly as against the lessee. Estate of Tawney v. Columbia Natural Res., LLC, 219 W. Va. 266, 273 (W. Va. 2006). Paragraph 10 (the unitization paragraph) of the

15

Braden lease is vague and ambiguous because it does not specify any limitation on unitization of lessor's property. As written, the rights and responsibilities of the lessee are vague, ambiguous, and unclear. Because this language in the lease is vague and ambiguous, the lease must be construed in favor of the lessor, Ms. Braden. This necessarily means the paragraph 10 language did not permit Chesapeake boundless authority to unitize the property into a unit that was otherwise unrelated to the subject property and could not in any way produce oil and/or gas from the then existing infrastructure. The Braden property was not properly unitized; the lease expired on August 23, 2012.

Since it is not the district court's role to "weigh the evidence and determine the truth of the matter" but instead to determine whether there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250. A district court considering a motion for summary judgment must view the evidence in the light most favorable to the nonmoving party, <u>Unus v. Kane</u>, 565 F.3d 103, 115 (4th Cir. 2009), and draw all inferences in favor of the nonmovant, <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Here, the language of paragraph 10 is ambiguous and is open to many interpretations. When viewed in a light most favorable to the non-moving party, Ms. Braden, and when the lease is viewed strictly against the lessee, Chesapeake,

16

the lease is language is not broad enough as written to permit the bad faith unitization of the Braden property into a unit that is geographically and otherwise unrelated to the subject unit. The "creative plan" concocted through the email conversation could not have materialized had the language of paragraph 10 been written clearly and fairly. It is not possible for an elderly layperson like Ms. Braden to understand at the time of execution that the paragraph 10 language could authorize Chesapeake to sweep her land up into a unit by a bad faith unitization. At the time of signing and all times thereafter, Chesapeake hid the possibility from Ms. Braden that the pooling clause could be exercised by simply typing the Braden property and lease information into a document and filing it with the West Virginia Department of Environmental Protection. A reasonable jury could find that the unitization language of paragraph 10 did not permit Chesapeake to unitize the property in the manner that it did and that the Braden lease, therefore expired on August 23, 2007.

## CONCLUSION

A *de novo* review of the facts surrounding the actions of Chesapeake in the Spring, Summer, and Fall of 2012 as they relate to Ms. Braden will reveal those actions were sneaky, underhanded, and deceptive. When Chesapeake could not secure Ms. Braden's written extension of the Braden lease, it hatched a deceptive bad faith plan to wrongfully capture her property solely so they would not need to

17

pay Ms. Braden the going market rate per acre (which was substantially higher in 2012 that it was in 2007) to sign another lease. Construing these facts in a light most favorable to Ms. Braden, it is clear that genuine issues of material exist concerning the actions of Chesapeake in unitizing the Braden property and that a reasonable jury could find that the bad faith unitization was not enough to extend the lease.

<strong>ORAL ARGUMENT REQUEST</strong>

Appellant requests oral argument in this matter as such oral argument could be useful to the Court in clarifying issues raised in this appeal regarding the unitization process, the facts surrounding the bad faith unitization of the Braden property, and how a reasonable jury could find in favor of Ms. Braden.

**FRANCES BRADEN**
**BY COUNSEL**

*/s/ Teresa C. Toriseva*
Teresa C. Toriseva, Esq.
W.Va. Bar ID# 6947
Joshua D. Miller, Esq.
W. Va. Bar ID #12439
TORISEVA LAW
1446 National Road
Wheeling, WV 26003
Telephone: (304) 238-0066
Facsimile: (304) 238-0149
Email: ceo@torisevalaw.com
Email:  jdm@torisevalaw.com

18

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>14-2384</u>          Caption: <u>Frances Braden v. Chesapeake Appalachia, L.L.C.</u>

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]     this brief contains _____4,620_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]     this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓]     this brief has been prepared in a proportionally spaced typeface using
   <u>Microsoft Word</u> [*identify word processing program*] in
   <u>Size 14/Times New Roman</u> [*identify font size and type style*]; *or*

   [ ]     this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) <u>Teresa C. Toriseva</u>

Attorney for <u>Appellant, Frances Braden</u>

Dated: <u>3/19/2015</u>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 19, 2015, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses list below:

Kenneth E. Tawney, Esq.
Jackson Kelly PLLC
PO Box 553
Charleston, WV 25322

Rodney W. Stieger
Jackson Kelly PLLC
PO Box 553
Charleston, WV 25322

/s/ Teresa C. Toriseva
Teresa C. Toriseva, Esq.
W.Va. Bar ID# 6947
Joshua D. Miller, Esq.
W. Va. Bar ID #12439
TORISEVA LAW
1446 National Road
Wheeling, WV 26003
Telephone: (304) 238-0066
Facsimile: (304) 238-0149
Email: ceo@torisevalaw.com
Email: jdm@torisevalaw.com

19